**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION**

TONYA L.,

        *Plaintiff,*                            Case No. 1:25-cv-10175

*v.*

                                         Patricia T. Morris

COMMISSIONER OF SOCIAL      United States Magistrate Judge
SECURITY,

        *Defendant.*

_____/

**MEMORANDUM OPINION AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 7, 9)**

## I.    CONCLUSION

Plaintiff Tonya L.'s motion for summary judgment will be **DENIED** (ECF No. 7), Defendant the Commissioner of Social Security's motion for summary judgment will be **GRANTED** (ECF No. 9), and the final decision of the Administrative Law Judge (ALJ) will be **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On November 22, 2021, Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income, alleging she became disabled on March 17, 2020. (ECF No. 5-1, PageID.33).  The Commissioner initially denied the applications on

July 20, 2022, and on reconsideration on November 16, 2022.  (*Id.*, PageID.33, 91–92, 119–20).  Plaintiff then requested a hearing before an ALJ, which was held on August 23, 2023.  (*Id.* at 33, 54–90).  The ALJ issued a written decision on October 27, 2023, finding Plaintiff was not disabled.  (*Id.* at PageID.30–53).  Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on November 18, 2024.  (*Id.* at PageID.17–21).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on January 17, 2025.  (ECF No. 1).  The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters."  (ECF No. 3).  Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 7, 9) as well as Plaintiff's response to the Commissioner's motion (ECF No. 10).

## B. Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her RFC, which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 17, 2020, the alleged onset date. (ECF No. 5-1, PageID.36).

At step two, the ALJ found the following severe impairments: fibromyalgia (FMS), anxiety, depression, colitis, diverticulitis, moderate to severe bilateral knee

osteoarthritis, bilateral knee subchondral cyst formation with sclerosis, osteophytes and joint space narrowing, morbid obesity, and cannabis dependence.  (*Id.*).

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing.  (*Id.* at PageID.37).

Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except Secondary to her combined physical impairments, the claimant is limited to Light work with the ability to occasionally lift and/or carry up to 20 pounds as defined in the regulations, as well as lift/carry 10 pounds frequently.  This includes sedentary work as defined in the regulations.  The claimant has no limits for sitting in an eight-hour workday.  She is capable of standing and/or walking for up to six hours in an eight-hour workday.  In the course of work, she should be allowed the ability to optionally alternate between sitting and standing about every 30 to 60 minutes, but such would not cause her to be off-task or leave workstation.  She is able to perform occasional postural functions of climbing ramps/stairs and stooping.  She is to perform no kneeling, no crawling, no crouching, no kneeling and no climbing of ladders/ropes/scaffolds.  The claimant is to perform no work that would involve hazardous situations such as work at unprotected heights or work around dangerous machinery that may cause harm to self or others.  No work with vibratory tools or equipment.  No exposure to work environments with bright flashing lights that could trigger a migraine, but normal office lighting is not affected.  The claimant is to perform no overhead lifting, no overhead carrying and no overhead reaching with the bilateral upper extremities; however, reaching in all other directions is not limited.  Secondary to her mental impairments, she retains the capacity to understand, remember and carry-out simple instructions and perform simple routine tasks as consistent with unskilled work.  The claimant can make judgments regarding simple work-related decisions.  The claimant can respond appropriately to routine usual work situations and deal with routine changes in a routine work setting.

(*Id.* at PageID.40–41).

At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.45).

However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at Page.45–46). Specifically, the ALJ found Plaintiff could perform the requirements of a cashier II (467,033 jobs in the national economy), a marker (136,791), a surveillance system worker (17,000), and an election clerk (5,569). (*Id.* at PageID.46). Thus, the ALJ concluded Plaintiff was not disabled. (*Id.* at PageID.47).

### E.    Administrative Record

On appeal, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he failed to properly (1) consider Plaintiff's subjective testimony; (2) evaluate whether Plaintiff's impairments equaled Listing 14.09 for inflammatory arthritis; and (3) fully incorporate Plaintiff's impairments in the hypotheticals posed to the vocational expert (VE). While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

Primary care records from the relevant period reflect that Plaintiff often told her providers that she was experiencing musculoskeletal symptoms.

On July 22, 2020, Plaintiff sought treatment for the new onset of a muscle

spasm in her neck.  (ECF No. 5-2, PageID.453, 456).  On examination, Plaintiff exhibited reduced range of motion in her cervical spine; other findings were normal. (*Id.* at PageID.456).  To treat her neck spasm, Plaintiff was prescribed baclofen (a muscle relaxant) 10 mg and instructed to apply a warm compress to the painful area every day.  (*Id.*).  The provider's records from this visit as well as a July 1, 2020 visit,[1] suggest that he suspected a bone spur was the cause of Plaintiff's neck pain, and he recommended she switch from ibuprofen to naproxen—both nonsteroidal anti-inflammatory drugs (NSAIDs)—to manage her pain.  (*Id.*).  The provider noted that "pain is more so on touching the area and mild pain on ROM - side bending and rotation ROM."  (*Id.*).

At an appointment a few weeks later, Plaintiff followed up about her neck pain, which she reported was "better at this visit."  (*Id.* at PageID.448, 452).  The only abnormalities noted on examination were tenderness, somatic dysfunction, and decreased range of motion of the cervical spine.  (*Id.* at PageID.451).  Plaintiff's dose of baclofen was increased from 10 to 20 mg and she was again instructed to apply a warm compress daily.  (*Id.* at PageID.452).  A couple of weeks later, Plaintiff had another return visit; this time reporting pain in her neck, left elbow, and left hip. (*Id.* at PageID.441, 443–45).

---

[1] Plaintiff first presented to this provider on July 1, complaining of new lumps on her neck. Testing was performed in the weeks between the July appointments.  (ECF No. 5-2, PageID.457–62).

On September 3, 2020, Plaintiff again reported neck, left elbow, and left hip pain, which she described as constant 5/10 pain. (*Id.* at PageID.434, 438). On examination, Plaintiff demonstrated normal stance and gait as well as normal appearance and range of motion in her extremities and spine. (*Id.* at PageID.438). The only abnormal findings were tenderness and pain with motion in her shoulders and elbows. (*Id.*). She was referred to rheumatology for further assessment of her joint pain. (*Id.*).

At a July 26, 2021 appointment, Plaintiff reported "arthralgias/joint pain and back pain; shoulders, hips, back, wrists, knees fibromyalgia[;] using a cane to walk." (*Id.* at PageID.421, 427). Following examination, the provider only noted that Plaintiff demonstrated limited mobility and used a cane. (*Id.* at PageID.427). Then on September 29, Plaintiff complained of "muscle aches, arthralgias/joint pain, and back pain." (ECF No. 5-1, PageID.404, 408). At this appointment, the provider noted Plaintiff had an "antalgic gait and limited mobility: using cane (and wearing knee support right knee) and normal stance." (*Id.* at PageID.409). On examination, Plaintiff's lumbar and cervical spines were largely normal, but both exhibited tenderness with additional findings of reduced range of motion of the cervical spine and paraspinal muscle spasm of the lumbar spine. (*Id.*). The provider stated that Plaintiff's osteoarthritis of the knee was chronic and stable, and referred Plaintiff to an orthopedic surgeon for follow-up. (*Id.*).

At a February 23, 2022 visit to renew her medications, Plaintiff complained of "muscle aches, arthralgias/joint pain, and back pain," and exhibited an "antalgic gait and limited mobility: using cane." (ECF No. 5-2, PageID.582, 586). On June 20, 2022, Plaintiff reported "muscle aches, arthralgias/joint pain, and back pain"; the provider noted Plaintiff had an "antalgic gait and limited mobility: using cane." (*Id.* at PageID.575, 580). The provider described Plaintiff's neck spasm as chronic and stable, noting "[s]he has been using the baclofen and she finds it helpful for her neck pain and requests refill." (*Id.* at PageID.580). Her fibromyalgia was similarly noted to be chronic and stable, with her prescription for tramadol refilled. (*Id.* at PageID.581).

In addition to treating with her primary care providers, Plaintiff also treated with the Allergy & Arthritis Treatment Center, LLC, beginning on September 8, 2020, "for multiple joint pain." (*Id.* at PageID.677). At her first appointment, Plaintiff reported numerous painful areas, including her neck, left shoulder, and left hip. (*Id.*). She further reported that she "has no trouble walking" and "doesn't feel unsteady on her feet." (*Id.*). The provider noted: "The patient is self-sufficient, independent, and is able to perform all ADLs [(activities of daily living)] and IADLs without restriction or functional limitations." (*Id.* at PageID.678). Plaintiff's muscoskeletal system was largely normal on examination, with the exception of nonarticular tenderness, about which the provider wrote:

> Tender points in a localized lesion of the hips and shoulders were present.  Point tenderness 2 cm above and below the epicondyles, and at the trochanteric bursa was noted.  <u>The distribution, character, and degree of tenderness at the tender points is consistent with the ACR criteria of greater than 11/18 tender points sufficient to support the diagnosis of fibromyalgia</u>.

(*Id.* at PageID.680 (emphasis in original)).  The provider also noted that Plaintiff's "[g]ait was normal throughout all phases (heel strike, midstance, push off and swing phase) with no abnormality in the kinetic change."  (*Id.*).

During subsequent appointments, Plaintiff routinely complained of pain in one or more body parts.  On October 1, 2020, Plaintiff said that "[s]he hurts all over," her "fatigue has gotten worse," and she has begun stumbling when walking.  (*Id.* at PageID.668).   Then on November 12, Plaintiff complained of hip pain, neck stiffness, and lower back soreness as well as swelling in her right knee that lasted "for about a week and made it hard to walk."  (*Id.* at PageID.656).

A few months later, on January 26, 2021, Plaintiff reported that her worst pain was in the left side of her body, particularly her shoulder, which was treated with an in-office injection.  (*Id.* at PageID.647, 653).  The provider noted:

> The patient appears to be doing well regarding musculoskeletal complaints of fibromyalgia.  Pain is rated at 0–1/10, described as only a sense of inconvenient aching, stiffness, stinging, throbbing, and tingling along the outlined hip and shoulder girdle and fingertips.  Activities such as brushing of the hair, and getting up off an armless chair, and hanging up clothing seem to be much better tolerated.  Performing activities of daily living such as bathing, cooking, cleaning, dressing, and shopping are not a problem.  No sensitivity to exposure to hot/cold temperatures is reported.  Symptoms of aching, numbness,

> and throbbing are less prone to worsening with repetitive activities. Quiet sitting for more than 30–45 minutes at a time is also better tolerated. Duration of morning stiffness is less just a few minutes long. No significant functional limitations are reported as a consequence of this problem.

(*Id.* at PageID.647).   Then on April 26, Plaintiff reported that her pain had been worse over the last few months and that she had not experienced any benefit from the shoulder injection.  (*Id.* at PageID.639).   Next on August 11, Plaintiff reported pain in numerous body parts including her lower back, left hip, left shoulder, and right knee.  (*Id.* at PageID.631).   Plaintiff continued to report widespread pain on September 27.  (*Id.* at PageID.623).

On November 29, 2021, Plaintiff reported that her back had been bothering her for a couple of days, including one day where "she was unable to move around because of the pain."  (*Id.* at PageID.563).   Plaintiff also reported "the normal aches and pain that are rated at a 5 [out of 10]."  (*Id.*).   Then on February 3, 2022, Plaintiff complained of increased pain, including in her right knee and left hand.  (*Id.* at PageID.609).   At this visit, the provider noted: "Fibromyalgia continues to be a problem which affects this patient's everyday activities and ability to function. Medication use seems to be helpful to some extent.  Continue with medications and encourage activity, meditation, and regular aerobic activities."  (*Id.* at PageID.613).

At these appointments, Plaintiff's medications were reviewed, and she was generally prescribed several medications at a time to manage her fibromyalgia.  (*Id.*

at PageID.565–66, 613, 626–27, 634, 642–43, 651–53, 660–61, 672).   Physical examinations continued to result in the same findings as those from Plaintiff's first appointment.  (*Id.* at PageID.565, 611, 625–26, 633–34, 641–42, 650–51, 659–60, 671).

During the relevant period, imaging revealed the following:

- **<u>July 1, 2020</u>:**

  o Skull x-rays – "unremarkable radiographic appearance" (ECF No. 5-2, PageID.496)

- **<u>July 16, 2020</u>:**

  o Brain MRI – "showed posterior enlarged lymph node along the left occipital area possibly inflammatory in origin" (ECF No. 5-2, PageID.456, 492–93)

- **<u>August 19, 2020</u>:**

  o Left hip/pelvis – "minimal osteoarthritic changes at the left hip and these are similar to the right side" (ECF No. 5-2, PageID.490)

  o Cervical spine x-rays – negative for any abnormal findings (ECF No. 5-2, PageID.491)

- **<u>September 13, 2021</u>:**

  o Right knee x-rays – "loose bodies by patella" (ECF No. 5-1, PageID.407; ECF No. 5-2, PageID.472)

      o Thoracic and lumbar spine x-rays – "mild narrowing L3-4, 4-5, mild spondylosis, mild scoliosis, mild spondylosis" (ECF No. 5-1, PageID.407; ECF No. 5-2, PageID.473–74)

- **<u>July 20, 2022</u>:**

      o Knee x-rays – findings associated with "[m]oderate to severe degenerative changes" (ECF No. 5-2, PageID.604)

Other evidence is discussed as relevant below.

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

14

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to:

15

(1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical

finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

    (i)    Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

    (ii)    Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

    (iii)    Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

    (iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

    (v)    Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this

determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a
> medical source who has received advanced education and training to
> become a specialist may be more persuasive about medical issues
> related to his or her area of specialty than the medical opinion or prior
> administrative medical finding of a medical source who is not a
> specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many

> types of evidence from different sources, it is not administratively
> feasible for [the ALJ] to articulate in each determination or decision
> how [he or she] considered all of the factors for all of the medical
> opinions and prior administrative medical findings in [each] case
> record.   Instead, when a medical source provides multiple medical
> opinion(s) or prior administrative finding(s), [the ALJ] will articulate
> how [he or she] considered the medical opinions or prior administrative
> findings from that medical source together in a single analysis using the
> factors listed in paragraphs (c)(1) through (c)(5) of this section, as
> appropriate.

*Id.* § 404.1520c(b)(1).   The regulation reiterates that the ALJ is "not required to

articulate how [he or she] considered each medical opinion or prior administrative

finding from one medical source individually."  *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of

this section) and consistency (paragraph (c)(2) of this section) are the most important

factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a

medical source's medical opinions or prior administrative medical findings to be."

*Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency
> factors for a medical source's medical opinions or prior administrative
> medical findings in [the claimant's] determination or decision.  [The
> SSA] may, but [is] not required to, explain how [it] considered the
> factors in paragraphs (c)(3) through (c)(5) of this section, as
> appropriate, when [it] articulate[s] how [it] consider[s] medical
> opinions and prior administrative medical findings in [the claimant's]
> case record.

*Id.*

When medical opinions or prior administrative findings are "equally

persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

    (i)    Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)   Statements about whether or not [the claimant has] a severe impairment(s);

(iii)   Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

(iv)   Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

(v)   Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

(vi)   Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

(vii)   Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

(viii)   Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits."   *Id.*   The SSA will, however, "consider all

21

of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

23

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)  Precipitating and aggravating factors;

      (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

      (v)    Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

      (vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a).  Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

      (1)    The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

      (2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

      (3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

      (4)    The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason

is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

## G.     Argument and Analysis

As stated above, Plaintiff raises three issues on appeal.  She argues that the ALJ's decision is not supported by substantial evidence because he failed to properly (1) consider Plaintiff's subjective testimony; (2) evaluate whether Plaintiff's impairments equaled Listing 14.09 for inflammatory arthritis; and (3) fully incorporate Plaintiff's impairments in the hypotheticals posed to the VE.  Each issue will be addressed in turn below.

### 1.     Subjective Symptoms

Plaintiff first argues that the ALJ erred because "[t]he ALJ's rejection of Plaintiff's allegations rests on a conclusory assertion that her statements were 'not entirely consistent' with the record (ECF No. 5-1, PageID.43), but this assertion lacks any meaningful engagement with the detailed medical findings that corroborate her symptom reports."  (ECF No. 7, PageID.809).

At the hearing, Plaintiff testified that she lived alone most of the time.  (ECF No. 5-1, PageID.62).  She further testified that she was able to drive, did so "[p]retty much every day," and currently was working part-time at a deli.  (*Id.* at PageID.62–63).  Plaintiff explained that she needed to take a pain pill to get through her four-

hour shifts and that she cried on the way home from work due to pain. (*Id.* at PageID.63). The pain was "[p]retty much everywhere," with her back being the worst, followed by her knees and shoulders. (*Id.* at PageID.64). Plaintiff was "in constant pain all day, every day," and struggled with movements such as bending over. (*Id.* at PageID.68). Plaintiff said she occasionally visited with her friends, enjoyed reading (particularly fantasy novels), watched TV and used her cellphone, and was somewhat able to keep up with household chores. (*Id.* at PageID. 64, 66, 67). Plaintiff also used marijuana daily to manage her pain and anxiety as well as a cane for stability while walking. (*Id.* at PageID.67, 74–75).

As discussed above, the ALJ was required to evaluate Plaintiff's alleged symptoms using a two-step process; allegations alone are not sufficient to establish an impairment or disability. *See also* SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). An ALJ's credibility finding about a claimant's alleged symptoms may be subject to a remand when he has ignored substantial record evidence or inappropriately discredited testimony without determining whether it was consistent with the medical record. *E.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725–26 (6th Cir. 2014). "[A]n ALJ's decision 'must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.'" *Murray v.*

*Comm'r of Soc. Sec.*, No. 17-cv-12586, 2018 WL 836480, at *3 (E.D. Mich. Feb.

13, 2018) (quoting SSR 16-3p, 2016 WL 1119029, at *9).

Here, the ALJ explicitly discussed why he discounted Plaintiff's subjective

symptoms at two points in his decision.  First, he explained:

> After careful consideration of the evidence, the undersigned finds that
> the claimant's medically determinable impairments could reasonably
> be expected to cause the alleged symptoms; however, the claimant's
> statements concerning the intensity, persistence and limiting effects of
> these symptoms are not entirely consistent with the medical evidence
> and other evidence in the record for the reasons explained in this
> decision.   As for the claimant's statements about the intensity,
> persistence, and limiting effects of his or her symptoms, they are
> inconsistent.

(ECF No. 5-1, PageID.44).  Second, he concluded:

> The undersigned has considered the pain allegations pursuant to Social
> Security Regulations and Social Security Ruling 16-3p and in
> accordance with § 404.1529(c)(4) and § 416.929(c)(4).   The
> undersigned concludes that the claimant's subjective pain complaints
> are greater subjectively alleged than supported by the above objective
> findings on examination supporting good motor strength, intact
> neurological findings and no evidence of atrophy.  It is evident from the
> record that the claimant is capable of performing work-related activities
> as consistent with the above-established residual functional capacity
> with latitude afforded by the undersigned to do light and sedentary work
> as inclusive within this RFC.   Although the claimant's subjective
> complaints have merit, the totality of the supporting medical evidence
> does not provide clinical correlation of his symptomology to the degree
> of debility alleged with objective findings on examination.  Based on
> the foregoing, the undersigned finds the claimant has the above residual
> functional capacity assessment, which is supported by the record as a
> whole and a finding of disability is not warranted in this case.

(*Id.* at PageID.44–45).

Preceding the first of the above-quoted paragraphs, the ALJ discussed the objective medical evidence of record.  His discussion included Plaintiff's frequent complaints of pain to her providers as well as the objective findings on examination and imaging.  (*Id.* at PageID.41–43).  In between the two above-quoted paragraphs, the ALJ provided three paragraphs of analysis regarding the medical opinions of record.  (*Id.* at PageID.44).

Plaintiff faults the ALJ for failing to explicitly discuss the regulatory factors meant to aid an assessment of the impact of a plaintiff's subjective symptoms. However, contrary to Plaintiff's argument that an ALJ *must* consider these factors (ECF No. 7, PageID.809), an ALJ instead "*may* consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions."  *Callahan v. Comm'r of Soc. Sec.*, No. 1:22-CV-01955, 2023 WL 5672863, at *15 (N.D. Ohio Aug. 10, 2023) (emphasis added), *report and recommendation adopted*, 2023 WL 5671922 (N.D. Ohio Sept. 1, 2023).  Indeed, "[t]he regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports [his] decision."  *Id.*; *see also Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's

subjective complaints." (quotation omitted)).

Here, the ALJ explicitly stated that he "considered the pain allegations pursuant to Social Security Regulations and Social Security Ruling 16-3p and in accordance with § 404.1529(c)(4) and § 416.929(c)(4)." (ECF No. 5-1, PageID.44). This case is thus analogous to *Callahan*, where a court rejected a similar argument, explaining:

> The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding [the plaintiff's] subjective symptom complaints not supported by the medical evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Looking first to the ALJ's evaluation of [the plaintiff's] subjective symptom complaints generally, the ALJ acknowledged her obligations under SSR 16-3P in the review of [the plaintiff's] complaints.  The ALJ also discussed [the plaintiff's] physical complaints and provided a review of the medial [sic] evidence.  Following this, the ALJ made clear statement indicating that she found that the medical evidence did not support [the plaintiff's] complaints.  The ALJ did not signal her findings by using the buzzwords associated with subjective symptoms complaints, *but reading the ALJ's analysis as a whole and with common sense, the ALJ clearly made those findings and articulated her reasons for rejecting [the plaintiff's] complaints. See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

*Callahan*, 2023 WL 5672863 at *15 (emphasis added and internal record citations omitted).  Also here as in *Callahan*,

> [c]ontrary to [the plaintiff's] argument, the ALJ manifestly did not reject [the plaintiff's] subjective complaints or, specifically, her pain complaints, because there was no 'objective' medical evidence to back them up.  The ALJ made her findings by comparing what [the plaintiff] alleged to what the medical records showed – or did not show.

*Id.* at *17.

Ultimately, the relevant question is whether substantial evidence supports the ALJ's decision and not whether substantial evidence supports Plaintiff's reading of the evidence. *Secka v. Comm'r of Soc. Sec. Admin.*, No. 4:21-CV-01948, 2023 WL 6065115, at *19 (N.D. Ohio Sept. 18, 2023). The Court concludes that substantial evidence supports the ALJ's decision. *See Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) ("The substantial evidence standard is met if a reasonable mind might accept the relevant evidence as adequate to support a conclusion." (citation modified)). While Plaintiff routinely reported pain in various body parts to her providers, the records (as summarized extensively above) show that relevant imaging findings were typically limited to degenerative changes without any acute findings such as fractures. Similarly, relevant examination findings were largely normal, with some findings of tenderness, reduced range of motion in the cervical spine, and a few mentions that Plaintiff's gait was antalgic as she presented to these visits with a cane. Because the ALJ's decision to discount Plaintiff's statements regarding her symptoms is supported by substantial evidence, Plaintiff's motion for summary judgment on this issue is denied.

## 2.   Listing 14.09 (Inflammatory Arthritis)

Plaintiff next argues that the ALJ erred by failing to consider whether her severe impairment of fibromyalgia equaled the listing for inflammatory arthritis. To

prevail on this argument,

> [a] claimant must do more than point to evidence on which the ALJ
> could have based his finding to raise a "substantial question" as to
> whether she has satisfied a listing. *Sheeks v. Comm'r of Soc. Sec.*,
> 544 F. App'x. 639, at 641–42 (finding claimant did not raise a
> substantial question as to satisfying the listing for intellectual disability
> where the ALJ's finding of borderline intellectual functioning simply
> left open the question of whether he meets a listing and where claimant
> pointed to only a few pieces of tenuous evidence addressing the listing).
> Rather, the claimant must point to specific evidence that demonstrates
> she reasonably could meet or equal every requirement of the listing.
> *See Sullivan*, 493 U.S. at 530 ("For a claimant to show that his
> impairment matches a listing, it must meet all of the specified medical
> criteria. An impairment that manifests only some of the criteria, no
> matter how severely, does not qualify."); *Foster v. Halter*, 279 F.3d
> 348, 354–55 (6th Cir. 2001) (claimant must satisfy the diagnostic
> description and one of the four sets of criteria); *see also Reynolds v.
> Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (holding
> that it was not harmless error for the ALJ to fail to analyze Step Three
> as to an impairment found to be severe at Step Two where the claimant
> put forth evidence that possibly could meet the relevant listing). Absent
> such evidence, the ALJ does not commit reversible error by failing to
> evaluate a listing at Step Three.

*Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432–33 (6th Cir. 2014)

(citation modified). Because the ALJ did not consider Listing 14.09, the Court

"therefore must determine whether the record evidence raises a substantial question

as to [Plaintiff's] ability to satisfy each requirement of the listing." *Id.*

"There is no listing for fibromyalgia because it 'is not a listed impairment.' "

*Angie M.B. v. Comm'r of Soc. Sec.*, No. 2:22-CV-2393, 2023 WL 3191578, at *5

(S.D. Ohio May 2, 2023) (quoting SSR 12-2p, 2012 WL 3104869, at *6). That said,

SSR 12-2p "instructs the ALJ to consider whether fibromyalgia 'medically equals a

listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.' " *Id.* Here, Plaintiff argues that she could equal the criteria under either Paragraph A(1)(b) or D of Listing 14.09.

> Listing 14.09(A)(1)(b) requires:
>
> Persistent inflammation or persistent deformity of one or more major joints in a lower extremity and medical documentation of an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09(A)(1)(b). Plaintiff is unable to equal this listing because there is no "documented medical need" in the record for her use of a cane. As the regulations explain:

> When we use the phrase "documented medical need," we mean that there is evidence from a medical source that supports your medical need for an assistive device for a continuous period of at least 12 months. This evidence must describe any limitation(s) in your upper or lower extremity functioning and the circumstances for which you need to use the assistive device. We do not require that you have a specific prescription for the assistive device.

*Id.*, § 1.00(C)(6). While Plaintiff attended a few appointments with a cane and indicated she used the device for balance, there is nothing in the record assessing her need for a cane nor explaining her reason for needing a cane. Courts have routinely found similar evidence insufficient to establish a documented medical need for an

assistive device.  *See, e.g.*, *Williams v. Comm'r of Soc. Sec.*, No. 2:16-CV-14065, 2018 WL 1322396, at *10 (E.D. Mich. Feb. 26, 2018) ("Although Plaintiff cites to instances in the record noting cane use, including his own testimony (which the ALJ found not entirely credible), he is unable to point to any objective medical evidence demonstrating the need for a cane while standing or walking." (internal footnote and citation omitted)), *report and recommendation adopted*, 2018 WL 1316167 (E.D. Mich. Mar. 14, 2018).   Accordingly, Plaintiff has failed to raise a substantial question as to her ability to satisfy the Paragraph A(1)(b) criteria.

Turning next to Listing 14.09(D), which requires:

Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09(D).  While the ALJ did not discuss this listing, he did discuss other listings where he made relevant findings.  *See Standen v. Comm'r of Soc. Sec. Admin.*, No. 1:15CV482, 2016 WL 11371452, at *13 (N.D. Ohio Jan. 6, 2016) ("At step three, although the ALJ should have reviewed the evidence under Listing 14.09, he did a thorough analysis of the evidence under related listings, and his decision reflected his opinion regarding Plaintiff's

rheumatoid arthritis and fibromyalgia beyond merely the objective medical evidence of physical deformities, such as subjective complaints of pain and functional limitations."), *report and recommendation adopted sub nom.*, *Standen v. Colvin*, 2016 WL 915254 (N.D. Ohio Mar. 7, 2016).  For example, the ALJ explained that

> [t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> In understanding, remembering or applying information, the claimant has a mild limitation.  The claimant takes care of her personal needs independently.  She also takes care of her child and she has a dog and cats that she takes care of.  She does not need any special reminders to take care of her personal needs and grooming.  She claims she needs help or reminders taking medicine.  She prepares her own meals daily.  She stated she does not need help or encouragement to do these things.  She does not need reminders to go places.  The claimant lives alone.  She drove [alone] to Michigan, which is a 3-day drive with breaks; the claimant is highly functional and works part-time.  The claimant lives alone and spends about 4 hours daily on her phone and watching television.  She spends 2 hours daily reading fantasy novels as an escape.  (See Exhibits 1E, 12E and Hearing Testimony).  In June 2022, the claimant presented as alert and oriented times three with good judgment and insight, Her mood was anxious and depressed with similar affect.  Her memory both recent and remote were normal.  Her chronic anxiety and depression were noted to be stable on medication.  The claimant was experiencing life stressors of having to relocate toMichigan (4Fp14).
>
> In interacting with others, the claimant has no limitation.  She goes

shopping in stores.  She enjoys walking in nature, taking hikes, reading, watching television, spending time with friends and family and doing crafts in her spare time.  She claims she does not spend time with friends and family much.   However, she stated she does spend time with other[s] in person and texting.  She does not have any problems getting along with family, friends, neighbors or others.  She says she gets along with authority figures well/great.  She has never been fired or laid off from a job because of problems getting along with other people (See Exhibits 1E, 12E and Hearing Testimony).

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation.  The claimant takes care of her personal needs independently.  She also takes care of her child and she has a dog and cats that she takes care of.  She does not need any special reminders to take care of her personal needs and grooming.   She prepares her own meals daily.  she has a driver's license and she drives a car.  She is able to pay bills, count change and manage a bank account. She enjoys walking in nature, taking hikes, reading, watching television, spending time with friends and family and doing crafts in her spare time.  She says she has no problems paying attention and no problems following instructions.  The claimant lives alone.  She drove [alone] to Michigan, which is a 3-day drive with breaks; the claimant is functional (See Exhibits 1E, 12E and Hearing Testimony).   Mental status examinations document that in July 2021, the claimant presented as alert and oriented times three with good judgment and insight,  Her mood was normal with normal affect. Her memory both recent and remote were normal.  She was diagnosed with stable anxiety (2Fp23 & 49).  In June 2022, the claimant presented as alert and oriented times three with good judgment and insight.  Her mood was anxious and depressed with similar affect.  Her memory both recent and remote were normal. Her chronic anxiety and depression were noted to be stable on medication.  The claimant was experiencing life stressors of having to relocate to Michigan (4Fp14).  By July 2023, the claimant presented as fully oriented and her mood was normal with normal affect.   Her behavior was normal except for being tearful when describing her physical symptons [sic].  She was maintained on Ativan three times daily for anxiety (11F p 70-71).

As for adapting or managing oneself, the claimant has experienced no limitation.   The claimant takes care of her personal needs

> independently.  She also takes care of her child and she has a dog and
> cats that she takes care of.  She does not need any special reminders to
> take care of her personal needs and grooming.  She prepares her own
> meals daily.  she has a driver's license and she drives a car.  She is able
> to pay bills, count change and manage a bank account.  She enjoys
> walking in nature, taking hikes, reading, watching television, spending
> time with friends and family and doing crafts in her spare time.  She
> does not need anyone to accompany her when she goes out.  The
> claimant lives alone and spends about 4 hours daily on her phone and
> watching television.  She spends 2 hours daily reading fantasy novels
> as an escape.  She drove [alone] to Michigan, which is a 3-day drive
> with breaks; the claimant is highly functional (See Exhibits1E, 12E and
> Hearing Testimony).

(ECF No. 5-1, PageID.38–40).

> Here, like in *Standen*,

> Plaintiff does not point to any evidence that was not considered by the
> ALJ in his decision, much of which was appropriately discredited, as
> discussed above.  Plaintiff merely re-argues her case based on evidence
> properly assessed by the ALJ, and does not provide any convincing
> argument to show how the evidence of record would meet or equal the
> requirements of Listing 14.09.

*Standen*, 2016 WL 11371452 at *13.  The ALJ's paragraph B analysis demonstrates

that he would not have found Plaintiff had a marked limitation in activities of daily

living, maintaining social functioning, or completing tasks in a timely manner due

to deficiencies in concentration, persistence, or pace if he had considered Listing

14.09(D).  Moreover, his paragraph B analysis is well-reasoned and supported by

substantial evidence.  *See Longworth*, 402 F.3d at 595.  Therefore, Plaintiff's motion

for summary judgment on this issue is denied.

### 3.    Vocational Expert

Finally, Plaintiff argues that "[b]ecause the ALJ failed to incorporate Plaintiff's full spectrum of symptoms and limitations into the RFC, the vocational expert's testimony—based on hypotheticals that did not include, for example, use of a cane, the need to elevate legs, or the need for extra breaks—is not reliable." (ECF No. 7, PageID.813).

"In the Sixth Circuit, a VE's testimony must be based on a hypothetical question that accurately portrays the claimant's physical and mental impairments." *Mitchell v. Comm'r of Soc. Sec.*, No. 13CV01969, 2014 WL 3738270, at *11 (N.D. Ohio July 29, 2014) (citing *Parley v.Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir.1987)).  Only testimony in response to accurate hypotheticals may be used as substantial evidence in making a disability determination.  *Id.*  "However, it is also 'well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact' into the hypothetical question." *Id.* (quoting *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

As previously discussed, there is no documented medical evidence that Plaintiff needed a cane.  Thus, the ALJ did not err by failing to incorporate use of a cane into the hypothetical questions posed to the VE.  *See id.* at *13 ("As there is no medical documentation establishing that Mitchell required the use of a cane and

describing the circumstances when it is needed, the ALJ did not err by omitting the use of a cane from his hypothetical questions to the vocational expert.") (collecting cases). Plaintiff's other arguments concerning the accuracy of the hypothetical posed to the VE fare no better because the Court agrees with the Commissioner that Plaintiff's "Step Five argument is a veiled attack on the ALJ's underlying RFC finding" because "this is not a scenario where the ALJ's hypothetical failed to match up to the RFC he ultimately imposed." *Kirchner v. Colvin*, No. 12-cv-15052, 2013 WL 5913972, at *11 (E.D. Mich. Nov. 4, 2013).

Plaintiff also challenges the validity of two of the jobs provided by the ALJ, specifically the jobs of surveillance systems monitor and election clerk. However, even assuming that Plaintiff is correct, her argument still fails because the other two jobs—cashier II (467,033 jobs in the national economy) and marker (136,791)—exist in significant number in the national economy. *See, e.g.*, *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) ("And the ALJ's finding here that 32,000 suitable jobs exist across the nation fits comfortably within what this court and others have deemed significant." (citation modified)) (collecting cases). Therefore, Plaintiff's motion for summary judgment is denied on this issue.

## III.   **ORDER**

In sum, the ALJ properly weighed the evidence and supported his findings with substantial evidence. While the evidence could support a different conclusion,

it is not the Court's job to re-weigh the evidence in the first instance.  For these reasons, Plaintiff's motion (ECF No. 7) is **DENIED**, the Commissioner's motion (ECF No. 9) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

      **IT IS SO ORDERED.**

Date: February 2, 2026                    S/PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge